**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Walter KORPAN, Defendant-Appellant.**

**No. 11669.**

United States Court of Appeals
Seventh Circuit.

Sept. 28, 1956.

Simon Herr, Robert A. Sprecher, and Frank A. Karaba, all of Chicago, Ill., for appellant.

Robert Tieken, U. S. Atty., Chicago, Ill., William A. Barnett, Asst. U. S. Atty., Chicago, Ill., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., for appellee.

Before DUFFY, Chief Judge, and SWAIM and SCHNACKENBERG, Circuit Judges.

SWAIM, Circuit Judge.

This case comes here on appeal from a judgment of the United States District

Court for the Northern District of Illinois, Eastern Division, finding the defendant, Walter Korpan, guilty of having violated § 7203 of Title 26 U.S.C.A., and fining the defendant $750.00 plus costs.

The indictment charged and the trial court found that the defendant, on premises occupied by him, maintained and permitted the use of certain coin-operated gaming devices as defined in § 4462(a) (2) of Title 26 U.S.C.A.; that the defendant thereby became obligated to pay the special occupation tax imposed by §. 4461(2) of Title 26 U.S.C.A.; and that the defendant willfully failed to pay such tax in violation of § 7203 of Title 26 U.S.C.A.

The decisive issue is whether the coin-operated machines in question are amusement devices as defined in Section 4462 (a) (1) or gaming devices as defined in paragraph (a) (2) thereof. If the machines here in question were described by subsection (a) (1) they were subject to a tax of only $10.00 a year but if they were gaming devices as described in subsection (a) (2) the annual tax on each machine was $250. 26 U.S.C.A. § 4461.

The facts, briefly, are as follows: The defendant operates a vacation resort known as "Korpan's Landing" in Fox Lake, Illinois. On August 12, 1955, certain coin-operated devices (commonly known as "pinball machines") were located in the resort's main building, a combination restaurant and tavern. On June 22, 1955, the defendant filed a tax return for the fiscal year July 1, 1955 through June 30, 1956, covering five amusement coin-operated devices and paid the tax of $10 per device. During the month of August 1955 the defendant exhibited an amusement device tax stamp for the machines in question.

The three machines involved in this litigation are basically alike. The insertion of a coin (a dime) activates the game and brings the first of five balls in front of a ball plunger. The game is played on an inclined board containing a number of holes into which the balls may enter. By pulling the plunger back and releasing it the ball is put into play. The legs of these games are so constructed as to allow a certain "give" which permits the player to "nudge" the machine forward, backward or sideward. The playing surface contains numerous rubber ringed posts and the player may nudge the game and cause the ball to contact one of these posts thereby increasing or cushioning the rebound of the ball. Scores are credited to the player if he causes a ball to roll into the holes. The scoring is registered on a vertical glass panel on the back of the board. Free replays are scored upon principles similar to bingo, i. e., the lighting of three, four or five lights in a row (horizontally, vertically or diagonally). The player to some extent may control the course the ball will travel on the playing surface. The ball plunger rests inside a ball guide plate which is calibrated with either six or seven scored lines to permit the player to gauge the intensity of his shots. This permits the player to attempt to shoot the ball to the right or left side of the playing field. As noted above, the player may nudge the game in an attempt to control the course of the ball once it enters the playing surface. Each machine is equipped with a "tilt" device (which may be adjusted), and if the game is nudged too strongly this device will cause the word "tilt" to appear on the scoring panel and make the machine inoperative until an additional coin is inserted. The possibility of scoring more replays (by raising the odds) is increased by depositing additional coins. Additional balls may also be secured by depositing additional coins when the original five balls have been expended. An extra ball is not always obtained by the deposit of an additional coin. The extra ball feature may either be disconnected or adjusted to increase or reduce the possibility of obtaining an extra ball. The machines also incorporate certain "game features" which afford additional methods of scoring replays. These "added attractions" are determined by an electrical system. The only control the player has over such features is by depositing additional coins which may or may not produce a given feature. The machines also house a de-

vice known as a "reflex unit." Although there was dispute as to its precise function, it appears that it more or less balances out the high winnings as against small winnings. That is, the total replays will tend to be the same over a given period of time. The replays that are won are registered by an electrical scoring mechanism on the scoreboard. The player has the choice of playing off the games won or of receiving money for them from the defendant. Each machine has a device called a replay meter housed behind a locked door next to the cash box inside the machine. When cash is paid for games won, the proprietor presses a cancellation button on the bottom of the machine which removes the games won from the scoreboard and registers them on the replay meter inside the machine. This serves as an accounting device which permits the collection man to determine the number of games paid for by the proprietor for the purpose of reimbursing him.

It is undisputed that on August 12, 1955, the defendant made cash payments to witness Annette L. Veit in the sum of $1 for ten replays and to witness John M. Shannon in the sum of $1.20 for twelve replays.

It is the contention of the defendant that the plain meaning of 26 U.S.C.A. § 4462(a) (2) and the intent of Congress in the enactment thereof expressly exclude the machines in question from the definition of gaming devices as set forth in that paragraph and that these machines are coin-operated amusement devices as defined in paragraph (a) (1) thereof.

The relevant portion of Section 4462 is as follows:

"§ 4462. Definition of coin-operated amusement or gaming device

"(a) In general.—As used in sections 4461 to 4463, inclusive, the term 'coin-operated amusement or gaming device' means—

"(1) any amusement or music machine operated by means of the insertion of a coin, token, or similar object, and

"(2) so-called 'slot' machines which operate by means of insertion of a coin, token, or similar object and which, by application of the element of chance, may deliver, or entitle the person playing or operating the machine to receive cash, premiums, merchandise, or tokens."

Section 4462(a) (2) lays down three requirements in defining a coin-operated gaming device: (1) it must be operated by means of the insertion of a coin or similar object; (2) the application of the element of chance must be involved by virtue of which, (3) the machine may deliver or entitle the person playing or operating the machine to receive cash, premiums, merchandise or tokens.

It is the Government's contention that if a particular machine incorporates these three incidents it meets the definition of a coin-operated gaming device and consequently is subject to the gaming tax rate of $250.00 for each such machine. The difficulty with this argument is that it overlooks the introductory language of paragraph (a) (2), *i. e.*, "so-called 'slot' machine."

If the dictionary definition of "slot machine" were applied, it is clear that these machines would be covered by the definition of coin-operated gaming device.

"A machine the operation of which is started by dropping a coin in a slot." Webster's New International Unabridged Dictionary, 2d Ed. 1955.

When this definition is considered with the choice of language employed by Congress, *i. e.*, "so-called 'slot' machines which operate by means of the insertion of a coin, token, or similar object * * *," it would appear that Congress intended a more restrictive meaning for the term "slot machine." Otherwise, there appears no purpose for the use of the language "so-called 'slot' machine."

■■■ The term "so-called" is a modifying word implying doubt as to the correctness or propriety of so designating a thing. See Webster's New International Unabridged Dictionary, 2d Ed. 1955. And the use of quotation marks to set off

the word "slot" indicates that Congress did not intend the language "so-called 'slot' machine" to be as comprehensive as the dictionary definition of "slot machine." Every word used in a statute is presumed to have a meaning and purpose, and, if possible, every word must be accorded significance and effect. Washington Market Co. v. Hoffman, 101 U.S. 112, 25 L.Ed. 782; Adler v. Northern Hotel Co., 7 Cir., 175 F.2d 619. We conclude, therefore, that not only must these machines incorporate the three incidents noted above, but they must also be "so-called 'slot' machines."

■ Since the term "so-called 'slot' machine" is not adequately defined in Section 4462 nor elsewhere in the Internal Revenue Code, it becomes necessary to resort to extrinsic evidence in order to accord meaning and purpose to this language.

The defendant in urging this point suggests that the term "slot machine" as used in Section 4462 refers specifically to a machine in which the insertion of a coin releases a lever or handle which, in turn, when pulled activates a series of spring-driven drums or reels with various insignia painted thereon, usually bells and fruit (colloquially called a "one-armed bandit").

There is force to this conclusion when the language thus employed is reviewed in light of the legislative history of Section 4462.

■ Before reviewing the legislative history of this statute it would be well to consider the argument advanced by the Government that the statute is clear and unambiguous, and that consequently there is no necessity for looking behind the words of the statute in order to determine what the intent of Congress was. We do not believe, however, that these words are sufficient in and of themselves to determine the purpose of the legislation. In such an event "When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may

appear on 'superficial examination.'" United States v. American Trucking Associations, Inc., 310 U.S. 534, at pages 543–544, 60 S.Ct. 1059, at page 1064, 84 L.Ed. 1345.

Sections 4461 to 4463 of the Internal Revenue Code were proposed by the House of Representatives of the 77th Congress. They were part of the Revenue Revision of 1941. As passed by the House a tax of $25 was assessed on each "coin-operated amusement and gaming device." H.R. 5417, § 555. These devices were defined as:

"(1) so-called 'pin-ball' and other similar amusement machines, operated by means of the insertion of a coin, token, or similar object, and

"(2) so-called 'slot' machines which operate by means of insertion of a coin, token, or similar object and which, by application of the element of chance, may deliver or entitle the person playing or operating the machine to receive cash, premiums, merchandise, or tokens." (Emphasis added.)

The report of the Ways and Means Committee also indicates an intent to exclude pinball machines from the category of slot machines. The report stated: "'Coin-operated amusement or gaming devices' are, briefly, machines which fall within the general classification colloquially referred to as 'pin-ball' machines and 'slot machines'." H.R.Rep. No.1040, 77th Cong. 1st Sess. P. 60 (1941). The proposed bill, as subsequently passed by the Senate, apparently accepted the exclusion of pinball machines from the definition of slot machines, and reduced the tax on the former to $10.00 per device and raised the tax on the latter to $50.00 per device. The report of the Senate Finance Committee explained its proposed amendment as follows:

"The House bill places a special tax of $25 per year upon each coin-operated amusement or gaming device maintained for use on any premises.

"Your Committee divides these devices into two categories. Upon *so-called pin-ball or other amusement devices* operated by the insertion of a coin or token, the tax is reduced to $10 per year. Upon so-called slot machines, however, the tax is placed at $200. per year." Sen.Rep.No. 673, 77th Cong. 1st Sess. P. 21 (1941). (Emphasis added.)

The House accepted the Senate amendments, See H.R.Rep.No.1203, 77th Cong. 1st Sess. P. 18 (1941), and the bill as amended became law as Section 3267 of the Internal Revenue Code of 1939, Public Law 250, 77th Cong. 1st Sess., 26 U.S.C.A. § 3267.

Subsequent to the outbreak of war Section 3267 was amended. The original language of the House bill of 1941 was amended to read: "any amusement or music machine * * *." H.R.7378, § 617. The purpose of the amendment was to enlarge the category of machines subject to taxation. It might be inferred that by dropping the term "pin-ball machine" from the definition of coin-operated amusement device Congress intended to treat such machines as gaming devices. However, in H.R.Rep.No.2333, 77th Cong. 2d Sess. P. 180 (1942), it was stated:

"This section amends section 3267 of the Code by defining the term 'coin-operated amusement devices' to include all amusement machines and music machines operated by means of the insertion of coins, tokens, or similar objects. Under this amendment there will be included *in addition to pin-ball machines* a great variety of other machines, such as baseball and football games, machine-gun games, music machines (so-called juke boxes), and many other types of coin-operated games."

(Emphasis added.)

See also Sen.Rep.No.1631, 77th Cong.2d Sess. P. 266 (1942), and Congressman Eberharter's statement made at hearings before the Committee on Ways and Means. Hearings, 83rd Cong.1st Sess. P. 2517.

With the exception of increases in the rate of taxation and technical changes of form adopted in 1954, the provisions of Section 3267, as amended in 1942, remain unchanged as Sections 4461 to 4463 of the Internal Revenue Code.

Although the legislative history of Section 4462 does not clearly demonstrate the meaning and purpose which Congress intended to attribute to the language, "so-called 'slot' machine," it does indicate that Congress intended to exclude pinball machines from the category of gaming devices.

■ The Government, nevertheless, contends that these machines are coin-operated gaming devices which entitled winning players to receive cash. The Government cites state court decisions holding that machines similar to the ones here involved are gaming devices. See People v. One Mechanical Device, 9 Ill. App.2d 38, 132 N.E.2d 338; State ex rel. Dussault v. Kilburn, 111 Mont. 400, 109 P.2d 1113, 135 A.L.R. 99. However, these cases are inapposite for they concern the construction of local legislation which employ terminology quite different from that in Section 4462. Cf. Ill.Rev.Stats. Ch. 38, § 342 (1955). The Government also cites Johnson v. Phinney, 5 Cir., 218 F.2d 303, for the proposition that a pinball machine is a game of chance. The issue there arose out of the applicability of the wagering tax and is clearly distinguishable. Further, the question here is not whether pinball machines are gaming devices or games of chance; that they are may well be conceded. The question is rather: are pinball machines embraced within the term "so-called 'slot' machines." Congress has clearly indicated that they are not.

■ Statutes which relate to the same thing or same class of things are often helpful in construing a particular statute. See Great Northern Ry. v. United States, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836.

The Johnson Act, passed on January 2, 1951, prohibits the interstate shipment

of gambling devices which it defines as follows:

"(1) any so-called 'slot machine' or any other machine or mechanical device an essential part of which is a drum or reel with insignia thereon and (A) which when operated may deliver, as a result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property; or

"(2) any machine or mechanical device designed and manufactured to operate by means of insertion of a coin, token, or similar object and designed and manufactured so that when operated it may deliver, as the result of the application of an element of chance, any money or property * * *." 15 U.S.C.A. § 1171.

If this definition were applied to the machines here involved it is clear that they are without its scope. A drum or reel with insignia thereon is not an essential part of defendant's machines, nor are these machines designed and manufactured so that when operated they may deliver any money or property.

We have been referred to only two cases which have considered the question before us. Tooley v. United States, D.C., 134 F.Supp. 162; United States v. One Bally Dude Ranch Coin-Operated Pin-Ball Machine, D.C.M.D.Tenn., 144 F.Supp. 930. The Tooley case was an action for refund of a portion of special occupation tax paid for a certain coin-operated device known as the "Side-bottom Super Crane Machine." [134 F.Supp. 163.] The court there did not consider the meaning of the term "so-called 'slot' machine," as used in the statute, but concluded that "the expression 'by application of the element of chance' as used in said Section 3267(b) (2) [predecessor to the statute here involved] merely requires that there be a substantial element of chance involved in the play of the machine, and does not require

that the element of chance predominate over the element of skill."

The defendant has urged that since the play of a pinball machine involves a modicum of skill it is not a machine which "by application of the element of chance * * * may deliver, or entitle the person playing or operating the machine to receive cash * * *." In our view of the case we do not reach this question and voice no opinion thereon.

The One Bally Dude Ranch case, a forfeiture action, was on a motion for summary judgment. We have been informed that a hearing on the merits had been continued.

The Government concludes from two cases under the Johnson Act, 15 U.S.C.A. § 1171, that devices far removed from "so-called 'slot' machines," i. e., certain "digger" machines, have been held subject to the gaming tax. United States v. 24 Digger Merchandising Machines, 8 Cir., 202 F.2d 647, certiorari denied 345 U.S. 998, 73 S.Ct. 1140, 97 L.Ed. 1404; United States v. 10, More or Less, Digger Machines, D.C., 109 F.Supp. 825. However, the Johnson Act contains a broader definition of "gambling device" than the definition which we must interpret in the instant case.

■■ Only one last point need be considered. The Government insists that Treasury Department regulations include pinball machines as gaming devices where unused free plays are redeemed, and such regulations are entitled to the force and effect of law. T.D. 5203, 1942–2 Cum.Bul. 276, 26 C.F.R. 323.22. But it is elementary law that a Treasury regulation which is inconsistent with a provision of the Internal Revenue Code has no force and effect. The Government, nevertheless, urges that these regulations have been in effect throughout subsequent amendments of Section 4462 and that it must therefore be assumed that the regulations have received Congressional approval.

We cannot assume on the facts of this case that Congress considered T.D. 5203, as stating the true construction of Section 4462 when it is shown that only

of late has the regulation been followed. See Casey v. Sterling Cider Co., 1 Cir., 294 F. 426.

We conclude that the pinball machines here involved are not gaming devices as defined in 26 U.S.C.A. § 4462(a) (2).

For the reasons set forth above, the judgment of the District Court is reversed.